**John DOE, Richard Roe and Samuel Poe, individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**Hon. George E. PATAKI, in his official capacity as Governor of the State of New York, et al., Defendants.**

No. 96 Civ. 1657 (DC).

United States District Court, S.D. New York.

March 21, 1996.

Robert M. Baum, Attorney-in-Charge, Criminal Defense Division, Legal Aid Society by Thomas M. O'Brien, Susan L. Hendricks, Michele Maxian, Special Litigation Unit, Norman Siegel, Donna Lieberman, New York Civil Liberties Union Foundation, New York City, for plaintiffs.

Dennis C. Vacco, Attorney General of State of New York by Christine E. Morrison, Assistant Attorney General, New York City, for defendants.

Mary Jo White, United States Attorney for Southern District of New York by Gideon A. Schor, Assistant United States Attorney, New York City, for amicus curiae United States.

Roger L. Stavis, New York City, for amicus curiae Assemblyman Daniel L. Feldman.

*OPINION AND ORDER*

CHIN, District Judge.

■ In this constitutional challenge to the New York State Sex Offender Registration Act, N.Y.Correction Law § 168 *et seq.* (McKinney Supp.1996) (the "Act"), commonly referred to as New York's "Megan's Law," plaintiffs move for a preliminary injunction enjoining retroactive application of the Act's registration and notification provisions.

■ This case presents a vivid example of the conflict that often arises between the rights of individuals and the needs of society as a whole. Defendants present compelling arguments in support of a registration and notification system for those who would victimize children and commit sex crimes. Indeed, defendants poignantly argue that it is a "sad commentary" on our society that we continue to name laws after children who have been murdered or abducted. (Tr. 45).[1] Nonetheless, no matter how compelling the reasons, no matter how pure the motive, constitutional protections for individuals— even unsympathetic ones—cannot be cast aside in the name of the greater good.

■ Would-be child abusers, rapists, and other sex offenders are on notice, and have been since the Act was passed, that if they commit these crimes now, they will subject themselves not only to possible imprisonment but also to strict registration requirements and perhaps intense public scrutiny. Those who committed their crimes before the Act took effect, however, have a right not to be punished on an *ex post facto* basis. The public notification provisions of the Act constitute punishment, and if their implementation is not enjoined, plaintiffs will suffer irreparable harm. Hence, plaintiffs' motion for a preliminary injunction is granted with respect to the public notification provisions of the Act. Because I find, however, that plaintiffs will not suffer irreparable harm if they are required to register during the pendency of this lawsuit, their motion is denied with respect to the registration provisions.[2]

---

1. References to "Tr." are to the transcript of the argument on March 18, 1996.

2. Plaintiffs also seek an order granting class action certification and permitting plaintiffs to file this action under pseudonyms. Defendants do not oppose the latter request; hence, plaintiffs may prosecute this case under pseudonyms, although they may be required, subject to a protective order, to reveal their identities in discovery.

## STATEMENT OF THE CASE

### A. *The Act*

#### 1. *Background*

The Act was passed on July 25, 1995 and became effective on January 21, 1996. It requires individuals convicted of certain sex offenses to register with law enforcement officials, and it authorizes those officials, in some circumstances, to notify the public of the identity and whereabouts of registrants.

At least 46 states have enacted laws requiring convicted sex offenders to register with law enforcement authorities. Many of these statutes also provide for public notification of the presence of registered sex offenders in local communities. The statutes resulted from growing public concern over the substantial threats presented by sex offenders and a belief that sex offenders as a group are more likely to repeat their crimes.

In enacting these laws, legislatures have articulated two goals: (i) enhancing law enforcement authorities' ability to fight sex crimes and (ii) protecting communities, and particularly children, by notifying them of the presence of individuals who, because of their history of committing sex crimes, may present a danger. Although some of these registration and notification laws have been in existence for a number of years, the laws are now commonly known as "Megan's Laws" because of the case of seven-year-old Megan Kanka, who was raped and murdered in 1994 by someone who lived across the street from her home. Unbeknownst to Megan and her family, the individual was a twice-convicted sex offender.

In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, 42 U.S.C. § 14071 *et seq.* (the "Federal Act"), which was named for an 11–year–old boy who was abducted when he was returning home from the store. The Federal Act encourages states, through funding incentives, to enact laws requiring individuals convicted of crimes against children or sexually violent offenses to register with state law enforce-

ment agencies. The Federal Act permits law enforcement authorities to release certain information in certain limited circumstances. *Id.* at § 14071(d). The Federal Act, however- er, does not require states to apply their particular laws retroactively.

To date, a number of registration statutes have been challenged in state courts. *See, e.g., Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995) (upholding New Jersey law); *State v. Ward*, 123 Wash.2d 488, 869 P.2d 1062 (1994) (upholding Washington law); *State v. Noble*, 171 Ariz. 171, 829 P.2d 1217 (1992) (upholding Arizona law). Only two federal courts have ruled on the constitutionality of sexual offender registration and notification acts. *See Artway v. Attorney General of New Jersey*, 876 F.Supp. 666 (D.N.J.1995); *Rowe v. Burton*, 884 F.Supp. 1372 (D.Alaska 1994). Both federal courts found constitutional infirmities with the statutes at issue. Judge Politan of the District of New Jersey and Judge Sedwick of the District of Alaska both held, in substance, that retroactive application of public notification provisions violated the *Ex Post Facto* Clause. *Artway*, 876 F.Supp. at 692; *Rowe*, 884 F.Supp. at 1380; *cf. Young v. Weston*, 898 F.Supp. 744 (W.D.Wa.1995) (holding unconstitutional, on *ex post facto* and other grounds, Washington's "Sexually Violent Predator" statute, which provided for involuntary commitment of "sexually violent predators" after they completed their sentences).

The New York State legislature used New Jersey's registration statute as a model, but attempted to cure the flaws noted by the court in *Artway*. The Act's preamble contains the following statement of the Legislature's purpose or findings:

> The legislature finds that the danger of recidivism posed by sex offenders, especially those sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior, and ... the protection of the public from these offenders is of paramount concern or interest to government. The legislature further finds that law enforcement agencies' efforts to protect their communities, con-

---

I need not decide the request for class certification, for defendants have agreed to be bound by the decision in this case with respect to other members of the proposed class.

duct investigations and quickly apprehend sex offenders are impaired by the lack of information about sex offenders who live within their jurisdiction and that the lack of information shared with the public may result in the failure of the criminal justice system to identify, investigate, apprehend and prosecute sex offenders.

The preamble then states that "[t]he system of registering sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct" and "will bring the state into compliance with the federal crime control act."

### 2. *Registration*

The Act establishes two categories of offenses that require registration: "Sex offense[s]," § 168–a(2), and "Sexually violent offense[s]," § 168–a(3). Sex offenses include, for example, convictions for rape in the second or third degree, sodomy in the second or third degree, or sexual abuse in the second degree, and convictions for attempt thereof. § 168–a(2) (*citing* N.Y.Penal Law §§ 130.25 130.30, 130.40, 130.45, 130.60 (McKinney 1987 & Supp.1996)). Sexually violent offenses include, for example, convictions for rape in the first degree, sodomy in the first degree, and sexual abuse in the first degree, and convictions for attempt thereof. § 168–a(3) (*citing* N.Y. Penal Law §§ 130.35, 130.50, 130.65 (McKinney 1987 & Supp.1996)).

Under the Act, a "sex offender" is any person convicted of a "sex offense" or a "sexually violent offense." § 168–a(1). Sex offenders are required to register with the Division of Criminal Justice Services (the "DCJS") within 10 days after discharge, parole, or release. § 168–f(1). Sex offenders who were "on parole or probation" on the effective date of the Act, *i.e.*, January 21, 1996, are required to register, § 168–g(2), even though the conduct that led to the conviction occurred before the Act was passed. Sex offenders must register annually for ten years as well as "within ten calendar days prior to any change of address."[3] §§ 168–f(2), (4), 168–h.

To register, sex offenders must provide such identifying information as name, date of birth, sex, race, height, weight, eye color, driver's license number, and home address. They must also provide a description of the offense, the date of conviction, and the sentence imposed as well as a photograph and fingerprints. §§ 168–b, 168–i.

The failure to register as required by the Act is a crime. § 168–t. Any sex offender required to register under the Act may petition the sentencing court to be relieved of the duty to register. § 168–o.

### 3. *Notification*

The Act provides for three levels of notification to law enforcement agencies and/or the public that increase as the risk of a "repeat offense" and danger to the public increases. § 168–l(6).

If the risk of a repeat offense is "low," the sex offender is assigned risk level one and only notification to law enforcement agencies is authorized. § 168–l(6)(a). Thus, this risk level does not provide for any public notification.

If the risk is "moderate," the offender is assigned risk level two. Under this level, the appropriate law enforcement agencies are notified and are authorized, in turn, to disseminate an "approximate address based on the sex offender's zip code," a photograph, and background information to "any entity with vulnerable populations." § 168–l(6)(b). The Act does not define the term "any entity with vulnerable populations," but the Act does provide that "[a]ny entity receiving information on a sex offender may disclose or further disseminate such information at [its] discretion." *Id.*

If the risk is "high" and there exists a "threat to the public safety," the offender is deemed a "sexually violent predator" and assigned risk level three. The level of notifi-

---

**3.** A "[s]exually violent predator," defined as a person convicted of a "sexually violent offense" or a "sex offender" who suffers from a "mental abnormality" that makes him or her "likely to engage in predatory sexual conduct," must regis-

ter annually and personally verify his or her registration at "the local law enforcement agency" every 90 days for at least ten years and potentially for life. §§ 168–a(7), 168–f(3), 168–h, 168–l(6)(c).

cation authorized for level two is also authorized for level three, except that law enforcement agencies are permitted to disclose not just an "approximate address" but the offender's "exact address." § 168–*l*(6)(c). Moreover, a level three offender is also to be included in a "subdirectory of sexually violent predators," which is to be maintained by the Division, that contains an exact address, other identifying information, and a photograph. The subdirectory will have listings by county and zip code, and a copy is to be distributed annually to local police departments for public access. A written request, however, will be required before access to the subdirectory is given. §§ 168–*l*(6)(c), 168–q.

Identifying information about all registrants—whether level one, two, or three—also will be available to the public through a special "900" telephone number, which was scheduled to become operational on March 8, 1996. Callers to the 900 number will not be able to obtain information about any person, however, unless they first provide some identifying information that reasonably identifies the person in question as a registrant. Moreover, the telephone calls will be recorded and callers will be required to identify themselves. § 168–p. The unauthorized release of any information constitutes a crime. § 168–u.

As to individuals who were still incarcerated on January 21, 1996, the Act provides that the sentencing court is to determine, prior to discharge, parole, or release, whether the offender is a sex offender or sexually violent predator and, if so, whether the offender is a risk level one, two, or three. § 168–n. The Act provides for the creation of a "board of examiners of sex offenders" (the "Board"), which is to make recommendations to the sentencing court regarding the appropriate risk levels. §§ 168–*l*(6), 168–n.

As to individuals who were on parole or probation *on* January 21, 1996, the Division of Parole and the Division of Probation and Correctional Alternatives are to "determine the duration of registration and notification." § 168–g(1). As to individuals who were "released on probation or discharged upon payment of a fine" based on a conviction *after* January 21, 1996, the sentencing court is to determine the "duration of registration ... and notification." § 168–d(2), (3).

## B. *The Facts*

### 1. *Plaintiffs*

Plaintiff John Doe was convicted of attempted rape in the first degree in 1990 and was sentenced to a period of incarceration. He was released on parole in 1994 and has remained on parole since then without incident. On February 5, 1996, he was notified that he had been classified as level 3. (Cmplt. ¶ 6).

Plaintiff Richard Roe was convicted of sexual abuse in the first degree in 1995. He was sentenced to probation and has remained on probation without incident. On February 21, 1996, he was notified that he had been classified as level 3. (Cmplt. ¶ 7).

Plaintiff Samuel Poe was convicted of attempted sodomy in the first degree in 1989 and was sentenced to a period of incarceration. He apparently is entitled to immediate conditional release from prison and will be paroled upon the Division of Parole's approval of his residence. In accordance with the Act, he will be required to appear before the state court for classification. (Cmplt. ¶ 8).

Plaintiffs sue on behalf of themselves as well as all others similarly situated—all persons in New York State who are or will be in the future incarcerated or on parole or probation after having been convicted of a sex offense or sexually violent offense committed *prior to the effective date of the Act,* January 21, 1996, and who have been or will be subject to the Act's registration and notification provisions. (Cmplt. ¶ 35).

### 2. *Defendants*

Named as defendants in this lawsuit, in their official capacities, are Governor Pataki; Paul Shechtman, the Commissioner of DCJS; Brion Travis, Chairman of the Board of Parole of the New York State Division of Parole Services; George Sanchez, Director of the New York State Division of Probation; and Elizabeth M. Devane, Chairperson of the New York State Board of Examiners of Sex Offenders. Defendants are the individuals

responsible for the implementation of the Act and the agencies involved in its operation.

### 3. *Application of the Act*

In support of their application for a preliminary injunction, plaintiffs have cited a number of incidents involving individuals who were required to register under the Act. At least three individuals in New York have been subjected to the Act's notification procedures. An individual who pled guilty to statutory rape and was sentenced to five years probation was apparently the first person to register under the Act. As reported in *The New York Times,* the Westchester County District Attorney's Office issued a news release and the registration process became "a media event." (O'Brien Aff. Exh. A).

In a second incident, a New York sex offender who is on parole was the subject of a mass mailing. After being informed by local police of the offender's release from prison, the superintendent of the school district in which the parolee resides, which includes several towns, sent a mass mailing to all residents of the district, identifying the parolee by name and address. The mailing consisted of a letter on the letterhead of the Superintendent of Schools addressed to "Parents, Guardians and Community Members." The parolee and his family—including family members who do not reside with him—have been subjected to harassment, including anonymous telephone calls, and the parolee lost his job as a result of the controversy generated by the mailing. (Hendricks Aff. ¶¶ 6–8 & Exh. A).

In a third incident, another New York sex offender who is on parole was also the subject of a mass mailing. On February 26, 1996, the Superintendent of Schools for the Cornwall Central School District sent a letter to all parents and guardians, stating that "a sex offender was released from prison back into the Cornwall community." (*Id.* at Exh. B). The letter did not identify the sex offender's name or address. Two days later, however, a local newspaper published a story containing the following bold-face headline in large type: "Sex offender's ID eludes Cornwall." (*Id.*). Not surprisingly, on February 29, 1996, several newspapers published stories containing the sex offender's name, picture, address, crime, and other information. (*Id.*).

Similar incidents occurred in New Jersey subsequent to the enactment of its Megan's Law. In one instance, a father and son broke into the home of a released child molester and mistakenly attacked the wrong person. (O'Brien Aff. Exh. B). In Englewood, New Jersey, the Guardian Angels passed out leaflets warning residents to "Beware" of a sex offender, "E.B.," who was challenging Megan's Law in federal court and resided in Englewood. Later, stating that "this should be a lesson to other sex offenders," a New Jersey resident traced E.B.'s name through court records and announced it on the steps of Englewood City Hall and on a radio program hosted by Guardian Angels leader Curtis Sliwa. (*Id.* at ¶ 26 & Exh. C).

### C. *Prior Proceedings*

On March 6, 1996, plaintiffs filed their complaint and moved by order to show cause for a preliminary injunction and a temporary restraining order. The next day, after hearing preliminary arguments on the issues raised by plaintiffs' motion, I issued a temporary restraining order, enjoining defendants from enforcing the notification provisions of the Act.

On March 18, 1996, counsel for the parties presented full arguments on the issues presently before me. At the conclusion of the hearing, I continued the restraining order until I issued a decision on plaintiffs' motion.

### DISCUSSION

### A. *Standards for Issuance of a Preliminary Injunction*

A plaintiff seeking a preliminary injunction or temporary restraining order usually must show (a) that it is likely to suffer irreparable harm if temporary injunctive relief is not granted and (b) either (i) likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decid-

edly in its favor. *Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77 (2d Cir.1994). Where the moving party "seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," however, that party must satisfy the likelihood of success on the merits prong of the test. *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (*quoting Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)). Accordingly, in this case plaintiffs must show irreparable harm and a likelihood of success on the merits.

## B. *Irreparable Harm*

■ I find that plaintiffs have shown, in part, that they are likely to suffer irreparable harm if immediate injunctive relief is not granted. It is well settled in this circuit that a moving party must show that the injury it may suffer is likely and imminent, not remote or speculative, and that this injury is not capable of being fully remedied by money damages. *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995). Here, plaintiffs have demonstrated that the injuries they will suffer are not speculative, for instances of irreparable harm have already been documented. Individuals registered with local authorities pursuant to the Act have faced public ridicule and harassment, have lost their jobs, and have been threatened with physical harm. (*See* Hendricks Aff. Exhs. A, B; O'Brien Aff. Exhs. A–C). Furthermore, the public stigma that has been placed on these individuals cannot be fully compensated through money damages. Thus, this type of injury satisfies the irreparable harm prong of the preliminary injunction test. *See Jolly v. Coughlin,* 76 F.3d 468, 481 (2d Cir.1996) (money damages inadequate to compensate physical injuries resulting from defendant's conduct); *Doe v. Dolton Elementary Sch. Dist. No. 148,* 694 F.Supp. 440, 447–48 (N.D.Ill.1988) (money damages inadequate to compensate emotional and psychological injury resulting from defendant's conduct).

■ Moreover, plaintiffs allege a violation of their constitutional right to be free from *ex post facto* laws. Such a constitutional injury is *per se* irreparable harm. *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992); *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). In each of the reported incidents concerning released sex offenders, the State's public notification of an individual's identity and his status as a sex offender triggered the harm. Accordingly, with respect to the public notification provisions of the Act, plaintiffs have satisfied their burden of showing irreparable harm.[4]

■ In contrast, plaintiffs have not satisfied their burden of showing irreparable harm with respect to the registration aspects of the Act. Merely informing the local police of their address, information that the police could obtain through other means, does not irreparably harm plaintiffs. Indeed, plaintiffs moved for a temporary restraining order only with respect to the public notification provisions of the Act. Because plaintiffs have not satisfied their burden with respect to the registration provisions, I need only discuss whether plaintiffs have demonstrated a likelihood of success on the merits regarding the public notification provisions of the Act.

## C. *Likelihood of Success on the Merits*

Plaintiffs' primary argument is that the Act imposes punitive measures that were not in effect at the time they committed their offenses. Thus, plaintiffs claim that the Act's retroactive application violates the *Ex Post Facto* Clause of the Constitution. Defendants respond that, while the Act imposes some burden on plaintiffs, it is not a punitive measure but is merely a regulatory scheme. Because the Act is purportedly regulatory, defendants argue that it cannot violate the *Ex Post Facto* Clause.

Thus, the parties agree that the critical issue before me is whether the Act is puni-

---

**4.** Counsel for defendants suggested at oral argument that, in evaluating the irreparable harm element, I should consider the potential irreparable harm to the community at large that an injunction may cause. (Tr. 44–45). I am acutely aware of the tragic events, most notably the death of Megan Kanka, that have led to the passage of the registration and notification laws. The argument is compelling. Nonetheless, the harm that plaintiffs will suffer by virtue of the *ex post facto* application of the Act's public notification provisions cannot be ignored.

tive or regulatory. If the Act is punitive, then its retroactive application violates the *Ex Post Facto* Clause. If the Act is regulatory, then its retroactive application is permissible. Because I hold that the public notification aspects of the Act impose additional punishment on plaintiffs, plaintiffs have demonstrated a likelihood of success on the merits.

### 1. *Ex Post Facto Laws*

 Article I, § 10, of the Constitution forbids the States from enacting any "ex post facto Law." The Supreme Court first interpreted this phrase in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). There, Justice Chase explained that the *Ex Post Facto* Clause prohibited state governments from passing laws that had the effect of punishing citizens for conduct after the fact. Specifically, Justice Chase noted four types of laws that the *Ex Post Facto* Clause prohibited: ·

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime*, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*.

*Id.* 3 U.S. at 390. This definition has remained relatively constant through time and has been repeatedly reaffirmed by the Supreme Court. *See, e.g., Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 (1990); *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810). Indeed, this prohibition against *ex post facto* laws was critically important to the drafters of our Constitution and remains a fundamental "constitutional bulwark in favor of personal security and private rights." The Federalist No. 44 at 301 (James Madison) (Jacob E. Cooke ed. 1961).

 The *Ex Post Facto* Clause serves two basic purposes. First, the clause is designed to ensure that legislative acts " 'give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.' " *Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (*quoting Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 963, 67 L.Ed.2d 17 (1981)). Second, the clause is designed to prevent legislatures from imposing arbitrary or vindictive legislation on individuals or classes of individuals. *Miller*, 482 U.S. at 429, 107 S.Ct. at 2450; *Weaver*, 450 U.S. at 29, 101 S.Ct. at 964; *see also James v. United States*, 366 U.S. 213, 248 n. 3, 81 S.Ct. 1052, 1070 n. 3, 6 L.Ed.2d 246 (1961) (Harlan, J., concurring in part and dissenting in part); *Malloy v. South Carolina*, 237 U.S. 180, 183, 35 S.Ct. 507, 508, 59 L.Ed. 905 (1915). As the Court stated in *Weaver:*

> The presence or absence of an affirmative, enforceable right is not relevant ... to the, *ex post facto* prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it· violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

*Weaver*, 450 U.S. at 30, 101 S.Ct. at 965.

Here, plaintiffs argue that the Act offends the third prong of Justice Chase's formulation and contend that the Act changed the punishment for certain sex crimes, inflicting greater punishment than what existed when these crimes were committed.

### 2. *Punitive v. Remedial Measures*

 The first step in determining whether a statute is punitive or regulatory is to review the legislature's intent in creating the measure. *See Austin v. United States*, 509

U.S. 602, 113 S.Ct. 2801, 2811, 125 L.Ed.2d 488 (1993); *United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980). If the legislature's intent is clearly punitive, then no further inquiry is required and the *Ex Post Facto* Clause applies. The mere fact that the legislature's intent is regulatory, however, does not end the inquiry. *See Department of Revenue of Montana v. Kurth Ranch,* —— U.S. ——, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994); *Collins,* 497 U.S. at 46, 110 S.Ct. at 2721. As defendants essentially concede (Tr. 33), a court must further undertake a historical and functional analysis to determine if the statute's effect is punitive. *Ward,* 448 U.S. at 249, 100 S.Ct. at 2641–42; *but see DeVeau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1154, 4 L.Ed.2d 1109 (1960) (suggesting that analysis should be limited to legislative intent).

In *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the Supreme Court set forth various factors that courts should consider in determining whether a civil sanction constitutes punishment for purposes of the Double Jeopardy Clause. These factors are relevant here. The Court noted that a sanction "constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." *Id.* at 448, 109 S.Ct. at 1901. The Court continued that

> [t]hese goals are familiar. We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence. Furthermore, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." From these premises, it follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is pun-

ishment, as we have come to understand the term.

*Id.* (citations omitted); *see also Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1944–45; *Austin,* 113 S.Ct. at 2806.

In addition, the Court has looked at other factors in determining whether a sanction is punitive or regulatory. Specifically, in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Court set forth "the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character." *Id.* at 168, 83 S.Ct. at 567. These tests include

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned....

*Id.* at 168–69, 83 S.Ct. at 567–68.[5] *See Rowe,* 884 F.Supp. at 1378–80 (applying *Kennedy* factors); *Artway,* 876 F.Supp. at 688–92 (applying *Kennedy* factors); *see also Doe v. Poritz,* 662 A.2d at 388–90 (discussing *Kennedy* factors, and concluding that courts should look at both "intent" and "effects," but suggesting that if effects are so "excessive" that they cannot be justified as "regulatory," a punitive intent must be inferred).

### 3. *The Public Notification Provisions Are Punitive*

After examining the Act's public notification provisions in light of all the foregoing factors, I hold that the public notification

---

5. Although the Supreme Court, somewhat confusingly, stated in a footnote in *Austin* that courts should not apply these factors in determining whether a statute violates the *Ex Post Facto* Clause, *Austin,* 509 U.S. at —— n.6, 113 S.Ct. at 2806 n. 6, these factors plainly aid in the overall inquiry. In fact, the Supreme Court relied on some of these factors in reaching its decisions in *Kurth Ranch, Austin,* and *Halper. See Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1946 (ana-

lyzing whether tax serves goals of punishment, whether tax was conditioned on commission of a crime, and whether behavior to which tax applies is already a crime); *Austin,* 509 U.S. at ——, 113 S.Ct. at 2806–08 (analyzing whether forfeiture was historically regarded as punishment); *Halper,* 490 U.S. at 435, 109 S.Ct. at 1894 (analyzing whether fine was punishment because it was excessive in relation to regulatory purpose asserted by the government).

provisions of the Act are punitive. Thus, retroactive application of these provisions violates the *Ex Post Facto* clause.

 Initially, I note that the New York State legislature plainly described the Act as regulatory in its preamble. As discussed above, however, "simply by labeling a law [regulatory], a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause." *Collins,* 497 U.S. at 46, 110 S.Ct. at 2721. Thus, I must review the Act's practical function and effect.

Five factors in particular convince me that the public notification aspects are punitive. First, public notification of one's crime has traditionally been viewed as punitive. *See People v. Letterlough,* 86 N.Y.2d 259, 631 N.Y.S.2d 105, 108, 655 N.E.2d 146 (1995) ("[P]ublic disclosure of a person's crime, and the attendant humiliation and public disgrace, has historically been regarded strictly as a form of punishment."). Indeed, as Judge Politan noted in *Artway,* the punitive nature of public notification of one's crime dates back to biblical times, as illustrated by the phrase "the Mark of Cain." 876 F.Supp. at 689. Accordingly, this factor favors a finding that public notification constitutes punishment.

Second, public notification serves at least one of the traditional goals of punishment— deterrence. "[P]unishments aim to deter future undesired conduct by visiting some significantly unpleasant consequence upon the criminal." *Rowe,* 884 F.Supp. at 1379. *See also Artway,* 876 F.Supp. at 689. Here, the Act's public notification provisions impose a "significant unpleasant consequence" upon plaintiffs. Dissemination of an offender's address and identity will inevitably cause him, at a minimum, to be ostracized by the community. Such public humiliation certainly would deter future criminal conduct. In fact, as noted above, because public notification may lead to more substantial harm, such as economic or physical harm, it arguably also serves the punitive goal of retribution. Because it serves either retributive or deterrent purposes, public notification should be considered punishment. *Halper,* 490 U.S. at 448, 109 S.Ct. at 1901.

Third, public notification imposes an affirmative disability or restraint on plaintiffs. Again, as has been well documented, public notification places a public stigma on plaintiffs. This stigma has a potentially devastating effect on plaintiffs' personal and professional lives. *Rowe,* 884 F.Supp. at 1378. Moreover, this impact is much broader than what could be expected through public access to judicial proceedings and criminal records. *See Artway,* 876 F.Supp. at 688–89; *see also Whalen v. Roe,* 429 U.S. 589, 605–06, 97 S.Ct. 869, 879–80, 51 L.Ed.2d 64 (1977) (distinguishing between the government's collection of personal data and the "unwarranted disclosure" thereof). Thus, this factor also favors a finding that public notification is punitive.

Fourth, the Act contains features that are classic indicia of a punitive scheme. Its provisions are triggered, of course, by behavior that is "already a crime." *Kennedy,* 372 U.S. at 168–69, 83 S.Ct. at 567–68. It provides for the sentencing judge to determine the level of notification. § 168–n. It also provides for consideration of victim impact statements in determining the public notification level. § 168–*l*(5)(i). These provisions certainly suggest that the public notification provisions are punitive in nature.

Finally, although defendants have articulated legitimate regulatory purposes for public notification, namely combatting recidivism, aiding law enforcement, and protecting the public, the Act's public notification provisions have already led to excessively harsh results. Individuals who have been subjected to community notification provisions have been publicly ostracized. They have been threatened with physical harm. Their families have been harassed. They have lost their jobs. And their crimes have been featured in newspapers for all to see. One could argue, depending on the crime involved, that these individuals deserved this treatment. One cannot argue, however, that this treatment was necessary to serve the Act's stated goals. Hence, the effect of the public notification provisions is to punish. *See Artway,* 876 F.Supp. at 692; *but see Doe v. Poritz,* 662 A.2d at 405 (holding that New Jersey Megan's Law has only a "regulatory

purpose" and that its provisions are "not excessive but are aimed solely at achieving, and, in fact, are likely to achieve, that regulatory purpose").

For these reasons, I hold that the public notification provisions of the Act, including the 900 number and all forms of public dissemination of information obtained from plaintiffs, constitute punitive, not regulatory, measures. Thus, application of these measures to individuals who committed their crimes before the Act was passed violates the *Ex Post Facto* Clause. Accordingly, plaintiffs have demonstrated a likelihood of success on the merits of their claim.

### 4. *Due Process and Statutory Claims*

Because I am granting plaintiffs' motion for a preliminary injunction on the grounds that the public notification provisions violate the *Ex Post Facto* Clause, I need not reach their due process and statutory arguments.

### *CONCLUSION*

Plaintiffs have demonstrated that they are likely to suffer irreparable harm and have demonstrated a likelihood of success on the merits. Accordingly, their motion for a preliminary injunction is granted. Defendants, their agents, employees, and all persons acting in concert with them are hereby preliminarily enjoined from enforcing the public notification provisions of New York's Sex Offender Registration Act, Article 6-C of the New York Correction Law, including §§ 168–*l*(6)(b, c), 168–p, and 168–q, against persons whose "sexual offense" occurred before January 21, 1996.

SO ORDERED.