481 F.3d 69
 John DOE, et al., individually and on behalf of all others similarly situated, Plaintiffs-Appellees,
v.
George E. PATAKI, in his official capacity as Governor of the State of New York, et al., Defendants-Appellants.
 Docket No. 06-2126-cv(L).
 Docket No. 06-3709-cv(CON).
 United States Court of Appeals, Second Circuit.
 Argued: August 30, 2006 and December 18, 2006.
 Decided: March 8, 2007.
 
 Richard Dearing, Asst. Solicitor Gen., New York, N.Y. (Eliot Spitzer, N.Y. State Atty. Gen., Louis H. Willenken, Asst. Atty. Gen., Michael S. Belohlavek, Senior Counsel, Office of the N.Y. State Atty. Gen., New York, N.Y., on the brief), for Defendants-Appellants.
 Thomas O'Brien, The Legal Aid Society, New York, N.Y., for Plaintiffs-Appellees.
 Before: NEWMAN, CABRANES, and POOLER, Circuit Judges.
 NEWMAN, Circuit Judge.
 
 
 1
 This appeal presents a novel issue arising in the context of interpreting a court-approved stipulation of settlement between private and governmental parties that is equivalent to a consent decree: do terms of the stipulation that recite provisions of state statutes in force at the time of the stipulation bind the governmental defendants to continue those provisions into the future notwithstanding later changes by a state legislature? This issue arises on an appeal by various New York State officials (collectively "the State") from two orders of the United States District Court for the Southern District of New York (Denny Chin, District Judge) entered in the course of protracted litigation concerning New York's Sex Offender Registration Act ("SORA" or the "Act"). The Plaintiffs are a group of convicted sex offenders required to register pursuant to the SORA. The District Court's orders, entered April 27, 2006, and July 18, 2006 (explained in detail below), have the effect of preventing the State from applying to the Plaintiffs recent statutory changes that (a) extended the time that many of the Plaintiffs are subject to the Act's registration requirements, and (b) broadened for some of the Plaintiffs the extent of the community notification required by the Act. We conclude that the stipulation was negotiated to avoid litigation over the procedures by which the Plaintiffs' risk levels would be redetermined, that the Plaintiffs are entitled to the benefit of those bargained-for procedures, that the Plaintiffs did not bargain to have the stipulation assure them the continued scope of state statutes existing at the time of the stipulation, and that the stipulation cannot be interpreted to preclude the application of subsequent legislative changes on matters distinct from the subject matter of the litigation. We therefore vacate the challenged orders.
 
 Background
 
 2
 The Sex Offender Registration Act. New York enacted the SORA, New York's version of a so-called "Megan's Law," in July 1995. See 1995 N.Y. Laws 2870 (codified at N.Y. Correct. Law §§ 168 to 168-w (McKinney 2003)). The SORA aims both to protect members of the public, especially vulnerable populations, from sex offenders by notifying them of the presence of sex offenders in their communities and to enhance law enforcement authorities' ability to investigate and prosecute sex offenses. See id. at 2870, § 1. To achieve these goals, the Act requires all convicted sex offenders ("the registrants") to register with law enforcement authorities and provides for the disclosure of information about the registrants to local law enforcement authorities, entities with vulnerable populations, and the public at large in enumerated circumstances.
 
 
 3
 All registrants remain in the SORA database for at least ten years, see N.Y. Correct. Law § 168-h(1), and the public may find out whether any particular individual is in the database, see id. § 168-p(1). Beyond these basic provisions, the Act varies the duration of registration and the extent of public notification depending on which of three risk categories is applicable. State officials place registrants in a risk category based on the perceived risk that a sex offender will commit another offense, see id. § 168-l (6). Under the original version of the Act, low-risk, or "level one" offenders, were obliged to remain registered for ten years, see id. § 168-h(1), and public notification was limited to responding to an inquiry concerning a particular individual (i.e., the database itself could not be searched, and information about level one offenders could not be disseminated to a member of the public without a specific inquiry). Moderate-risk, or "level two" offenders, also registered for ten years, see id., and local law enforcement agencies, without awaiting inquiry from the public, could disseminate certain information about level two offenders to entities with vulnerable populations, see id. § 168-l (6)(b). High-risk, or "level three" offenders, were subject to a lifetime registration requirement, see id. § 168-h(2), and certain information about them was contained in a publicly accessible subdirectory of the database, in addition to being disseminated by law enforcement authorities to vulnerable entities, see id. §§ 168-l (6)(c), 168-q. Level three offenders received the right to petition for relief from the registration and notification requirements after thirteen years. See id. § 168-o(1). The Act specified procedures for the determination of a sex offender's risk level.
 
 
 4
 Since its enactment, the SORA has undergone several amendments relevant to this litigation. In 1999, following the District Court's ruling that the Act's original procedures for determining risk levels violated sex offenders' procedural due process rights, see Doe v. Pataki ("Doe-SORA III"), 3 F.Supp.2d 456, 473 (S.D.N.Y. 1998), the New York legislature amended the SORA to incorporate the procedural due process protections required by Doe-SORA III, see 1999 N.Y. Laws 3061 (codified at scattered sections of N.Y. Correct. Law § 168 et seq.). The 1999 amendment applied prospectively to all risk determination hearings conducted after its effective date but did not provide for redetermination of risk levels previously assigned.
 
 
 5
 Next, in 2002, the SORA was again amended to create the classifications of "sexual predator," "sexually violent offender," and "predicate sex offender." See 2002 N.Y. Laws 66 (codified at scattered sections of N.Y. Correct. Law § 168 et seq.). After March 11, 2002 — the effective date of the 2002 amendment—a sex offender's classification as a "sexual predator," "sexually violent offender," or "predicate sex offender" required lifetime registration, regardless of risk level. See N.Y. Correct. Law § 168-h(2). A ten-year registration period applied to all other sex offenders whose risk levels were determined after March 11, 2002. See id. § 168-h(1). Sex offenders already classified as level one or level two risks as of March 11, 2002, retained the ten-year registration requirement. See id. Similarly, sex offenders already classified as level three risks continued under an obligation to register for life. See id. § 168-h(2). The 2002 amendment specified that the amended procedures for calculating the duration of an offender's registration requirement did not apply to the group of sex offenders whom the legislature considered to be members of the plaintiff class in the pending litigation.[1] See 2002 N.Y. Laws 66, 78.
 
 
 6
 In January 2006, as the ten-year registration period for many level one and level two registrants was approaching an end, the legislature amended the SORA to increase the length of the registration requirement "to enhance public safety and provide better tracking and monitoring of sex offenders." 2006 N.Y. Laws 1, § 1. The January 2006 amendment, which prompted the pending round of litigation, increased the registration requirement for level one offenders from ten to twenty years and required level two offenders to register for life, effective as of January 18, 2006. See id. § 3 (to be codified at N.Y. Correct. Law § 168-h). The January 2006 amendment gave level two offenders who are not designated as "sexual predators," "sexually violent offenders," or "predicate sex offenders" the right to petition for relief after thirty years. See id. at 2, § 5 (to be codified at N.Y. Correct. Law § 168-o).
 
 
 7
 The most recent amendment, effective June 23, 2006, changed the scope of community notification about level one and level two offenders. See 2006 N.Y. Laws 459. Under the June 2006 amendment, law enforcement agencies may disseminate information about level one offenders to entities with vulnerable populations, as previously authorized for level two offenders. See id. § 1(a) (to be codified at N.Y. Correct. Law. § 168-l (6)(a)). In addition, information about level two offenders will now be maintained in the publicly accessible subdirectory that previously contained information only about level three offenders. See id. § 1(b) (to be codified at N.Y. Correct. Law. § 168-l (6)(b)).
 
 
 8
 To summarize, the SORA, as it currently exists, provides the following. Level one offenders, other than those who have been classified as "sexual predators," "sexually violent offenders," or "predicate sex offenders," must register for twenty years, and information about all level one offenders can be distributed to entities with vulnerable populations but is not maintained in the publicly accessible subdirectory. Level two and level three offenders and all offenders who have been classified as "sexual predators," "sexually violent offenders," or "predicate sex offenders," regardless of risk level, must register for life, though level two offenders who have not received such classifications may petition for relief after thirty years. Level two and three offenders are identified in a publicly accessible subdirectory.
 
 
 9
 The pending litigation. In March 1996, the Plaintiffs—convicted sex offenders who were incarcerated, on parole, or on probation when the original SORA took effect on January 21, 1996—filed a class action in the District Court, alleging that the Act violated the Ex Post Facto Clause of the Constitution and deprived the Plaintiffs of their due process and equal protection rights. On cross-motions for summary judgment, the District Judge concluded that the SORA's community notification provisions violated the Ex Post Facto Clause and enjoined enforcement of these provisions against the Plaintiffs. See Doe v. Pataki ("Doe-SORA I"), 940 F.Supp. 603, 631 (S.D.N.Y.1996). On appeal, this Court reversed the District Judge's ruling that the community notification procedures violated the Ex Post Facto Clause and remanded the case for consideration of the Plaintiffs' other claims. Doe v. Pataki ("Doe-SORA II"), 120 F.3d 1263, 1285 (2d Cir.1997).[2]
 
 
 10
 On remand, the Plaintiffs again moved to enjoin enforcement of the SORA, this time on procedural due process grounds. The District Judge concluded that the registration and community notification provisions of the SORA implicated protected liberty interests, see Doe-SORA III, 3 F.Supp.2d at 467-68, and that the procedures by which risk levels were assigned did not provide adequate due process for protecting these interests, see id. at 468-72. The District Judge entered an injunction requiring that an offender (1) be given a court hearing; (2) receive advance notice of the hearing, its purpose, and the recommended risk level classification; (3) be given the right to retain counsel or the right to have counsel appointed if he cannot afford to retain counsel himself; (4) be given pre-hearing discovery of the evidence on which the risk level recommendation is based; and (5) be given the right to appeal. See id. at 471-72. Moreover, the Judge concluded, the State must bear the burden of proof and must prove the facts supporting the risk level recommendation by clear and convincing evidence. See id. at 472. The District Judge enjoined the State from classifying the Plaintiffs at a risk level other than level one until it reclassified them in accordance with the procedures required by the ruling. See id. at 479.
 
 
 11
 After the District Judge's procedural due process ruling in Doe-SORA III, the parties began settlement discussions. On November 22, 2000, having received no report of a final settlement, the District Judge issued an order dismissing the case without prejudice to reinstatement within sixty days if the parties were unable to reach a final settlement agreement. The parties neither reached agreement within sixty days nor requested an extension of time. Nonetheless, as was represented at the first of two oral arguments, the parties continued to operate as if the injunction was in effect notwithstanding the termination of the case. The parties completed settlement negotiations in June 2004, at which time they jointly moved for reinstatement of the case and approval of a Stipulation of Settlement ("the Stipulation").[3] The District Judge reinstated the action and "so ordered" the Stipulation on June 4, 2004.
 
 
 12
 The Stipulation, the stated purpose of which was to "settl[e] the disputes between [the parties] and avoid[] further litigation," specified detailed procedures for conducting redetermination hearings for level two and level three Plaintiffs and for notifying them of their right to such hearings. Of particular importance to the pending appeal is paragraph fifteen of the Stipulation, set out in full in the margin,[4] which provides, among other things, that a Plaintiff whose risk level is determined to be at level two "will be considered to be a level two offender as of March 11, 2002" and that, "therefore, the duration of the registration requirement will be 10 years from the date of his or her original registration." Attached to the Stipulation were a general notice of settlement to be sent to the Plaintiffs[5] and specific notices to be sent to level two and level three Plaintiffs, which explained level two and level three Plaintiffs' right to redetermination hearings, the procedures by which redetermination hearings would take place, and the duration-of-registration and scope-of-notification requirements for those classified under level one, two, or three.
 
 
 13
 Following the January 2006 amendment increasing the duration of the registration requirement for level one and level two offenders, the Plaintiffs filed a motion in the District Court for an order enforcing the Stipulation and enjoining the State from requiring level one or level two Plaintiffs to register beyond ten years. The Plaintiffs contended that paragraph fifteen of the Stipulation and the attached notices bound the State to a ten-year registration requirement for level one and level two Plaintiffs and that the application of the 2006 amendment to these Plaintiffs therefore breached the Stipulation. See Doe v. Pataki ("Doe-SORA IV"), 427 F.Supp.2d 398, 404 (S.D.N.Y.2006). In response, the State argued that the District Court lacked jurisdiction to enforce the Stipulation, id., and that, in any event, the Stipulation could not be construed to impose a ten-year limit on registration because it was concerned with the procedures for assessing risk levels, not the substantive consequences of such assessments, id. at 406. The District Judge, after first rejecting the State's jurisdictional argument,[6] see id. at 405-06, concluded that the parties had bargained for a ten-year registration period and that application of the January 2006 legislative amendment to level one and level two Plaintiffs therefore breached the parties' agreement, id. at 408-09. The District Judge enjoined enforcement of the January 2006 amendment to level one and level two offenders covered by the Stipulation, see id. at 413, but stayed his order pending appeal. The State filed a timely notice of appeal.
 
 
 14
 After the June 2006 amendment took effect, expanding the scope of community notification, the Plaintiffs sought clarification of the District Court's stay of the order in Doe-SORA IV granting injunctive relief. In particular, the Plaintiffs sought to confirm that the stay, which had allowed the State, pending appeal, to apply to the Plaintiffs the January 2006 amendment, extending the duration of registration, did not allow the State to apply to the Plaintiffs the June 2006 amendment, extending the scope of community notification. In an order entered July 18, 2006, the District Judge granted the Plaintiffs' motion, thereby enjoining the State from applying the June 2006 amendment and any subsequent amendments to level one and level two Plaintiffs. See Doe v. Pataki ("Doe-SORA V"), 439 F.Supp.2d 324, 325 (S.D.N.Y.2006) (noting that the stay of the April 27, 2006, injunction was granted only because "there was a risk that class members who were permitted to come off the registry would be difficult to locate for re-registration in the event of a reversal"). The District Judge subsequently denied the State's motion for clarification of the July 2006 injunction and later denied the State's motion for a stay of that injunction. In denying the State's stay motion, the District Judge reasoned that the Stipulation, by referring to the attached notices specifying "the community notification provisions applicable to each risk level," bound the State to the community notification provisions in effect in 2004 when the Stipulation was approved. He concluded, "The New [June 2006] [a]mendment . . . would increase the extent of public notification for both level 1 and level 2 class members beyond what the parties bargained for — and the Court `so ordered' — in the Stipulation." The State timely appealed the July 2006 injunction. This Court granted the State's motion to consolidate the two appeals (from the injunctions in Doe-SORA IV and Doe-SORA V) and denied its motion for a stay, leaving in effect the District Judge's stay. After hearing an initial argument, we granted the Plaintiffs-Appellees' request to hear oral argument in No. 06-3709-cv, the appeal from the injunction in Doe-Sora V, concerning the scope of community notification.
 
 
 15
 As a result of the District Court's various rulings and its stay, the current situation is that, pending appeal, the January 2006 legislative amendment, extending the duration-of-registration requirements, is effective against the Plaintiffs, but the State is enjoined from enforcing against the Plaintiffs the June 2006 legislative amendment, expanding the scope-of-notification requirements.
 
 
 16
 Plaintiffs' waivers of redetermination hearings. As explained above, the Stipulation provides that level two and level three Plaintiffs are entitled to have their risk levels redetermined pursuant to the procedures ordered by the District Court. The Stipulation also provides for notice to the level two and level three Plaintiffs, informing them of their option to contest the original risk level at a redetermination hearing or to accept the original risk level. The notice included a form for exercising the option and also informed the affected Plaintiffs that failure to return the form would be deemed a waiver of the right to a redetermination hearing. After the January 2006 amendment extending the duration of registration, the Plaintiffs, in their injunction request, complained to the District Court that the waiver provision had become unfair to level two Plaintiffs because some of them who were nearing the end of their ten-year period of registration had waived a redetermination of risk level without awareness of the extension of the registration period to lifetime registration. After the initial oral argument of this appeal, the State advised this Court that it will afford all level two Plaintiffs who waived their redetermination hearing a new opportunity to request such a hearing.
 
 Discussion
 
 17
 The basic principles governing interpretation of consent decrees and their underlying stipulations are well known. Such decrees reflect a contract between the parties (as well as a judicial pronouncement), and ordinary rules of contract interpretation are generally applicable. See United States v. ITT Continental Baking Co., 420 U.S. 223, 236-37, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); Crumpton v. Bridgeport Education Ass'n, 993 F.2d 1023, 1028 (2d Cir.1993). Often deference is given to the interpretation made by the district judge who approves the decree, a precept especially appropriate in circumstances where the judge has played a role in supervising the negotiation of the terms of the decree. See, e.g., Audiovisual Publishers, Inc. v. Cenco Inc., 185 F.3d 93, 95-96 (2d Cir.1999); United States v. Local 359, United Seafood Workers, 55 F.3d 64, 68 (2d Cir.1995).[7]
 
 
 18
 In the pending case, the Plaintiffs and the District Judge are of the view that these principles and only these principles dictate the outcome of the appeal. In their view, the State is bound to apply the provisions of SORA, including those governing the duration of registration and the scope of community notification, as they existed at the time the decree was entered, because the Stipulation for the decree and the attached notices explicitly mention the duration of registration and the scope of community notification for the various risk levels as they then existed.
 
 
 19
 We recognize that the duration of registration and the scope of community notification, as they existed under state law at the time of the Stipulation, are explicitly set forth in the Stipulation or incorporated by the attached notices, and there is no dispute as to the meaning of the words in these recitations, e.g., "ten years" means "ten years." What is in dispute is the operative effect of these recitations, i.e., whether these recitations are included only for informational purposes to reflect then-current state law, as the State contends, or as binding commitments precluding application of subsequent legislative changes to the Plaintiff class, as the Plaintiffs contend.[8] This issue requires construction of the Stipulation, a matter to be considered de novo on review. See Lee v. BSB Greenwich Mortgage L.P., 267 F.3d 172, 178 (2d Cir.2001). Moreover, the normal rules of construction may vary depending on the nature of the parties and the effect of enforcement. In the pending matter, one of the parties is a state, and the effect of enforcement of the language reciting the duration of registration and the scope of community notification would be to prohibit the State from applying subsequent legislation on these topics to the Plaintiff class.
 
 
 20
 Proper construction of the recitations at issue, we believe, depends not only on the words of the Stipulation, but also, and more importantly, on whether the parties intended to place those words in the agreement as part of a resolution of disputed matters for which the parties had bargained, or only to illustrate the provisions of then-existing state law. That intent, properly assessed based on objective indicia, see Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir.1997), can be ascertained initially in this case from the nature of the litigation. After losing their Ex Post Facto Clause challenge to the SORA, the Plaintiffs returned to the District Court solely to challenge the procedures for determining offender risk levels. There is no indication, however, that the Plaintiffs sought to have the duration-of-registration or the scope-of-notification requirements remain unaltered by subsequent state legislation. Maintenance of these requirements was neither the subject of any claim in the lawsuit nor the subject of any bargaining between the parties in the course of settling the lawsuit.[9] The Plaintiffs successfully litigated their procedural due process claim and ultimately secured the agreement of the State to incorporate into a consent decree the hearing procedures they had sought.
 
 
 21
 The limited nature of the litigation strongly indicates that the recitations concerning duration of registration and scope of community notification were not included to secure a prohibition on subsequent state legislation on these topics. Indeed, had the case proceeded to final adjudication in favor of the Plaintiffs, instead of settlement, it is extremely doubtful that the Plaintiffs would have been entitled to a judgment that prohibited the State from amending the then-current provisions concerning duration of registration and scope of community notification.[10]
 
 
 22
 Moreover, in a case such as this, how a court should determine what the parties intended the operative effect of their duration and scope recitations to be should reflect traditional concerns regarding a federal court's authority to restrict a state's inherent powers. There is no doubt that a federal court is obliged to determine whether properly challenged state legislation violates the Constitution, a responsibility that the District Court discharged in this litigation in ruling that SORA was unconstitutional for lack of procedures required by the Due Process Clause of the Fourteenth Amendment. We need not review the correctness of that ruling because it is not challenged on this appeal. Moreover, the parties subsequently incorporated those procedural requirements into a consent decree and, indeed, the State legislature itself enacted legislation that also incorporated those procedures.
 
 
 23
 However, although federal courts have authority to abrogate state laws on the grounds of claimed unconstitutionality or preemption pursuant to paramount federal legislation, they have only the most limited role when determining whether a state has surrendered some inherent authority, such as its authority to modify state statutory law. We assume that in the course of settling a federal lawsuit, parties could bargain for the continued force of a state law provision as it existed at the time of their agreement. In some circumstances, a state might obtain substantial benefits by narrowing the scope of a ruling of unconstitutionality or lessening the scope of a federal court remedy in exchange for its commitment not to alter a provision of then-existing state law.[11] But proper regard for state authority requires a federal court to have a clear indication that a state has intended to surrender its normal authority to amend its statutes.[12]
 
 
 24
 In other contexts concerning state authority, the Supreme Court has similarly instructed federal courts not to impair state authority absent a clear statement that the relevant governing principle applies. For example, the Supreme Court has frequently instructed that a state will not be deemed to have waived its sovereign immunity unless the waiver is "express" and "unequivocal." College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 666, 680, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); see Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 306, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (general consent to suit provision insufficient to waive Eleventh Amendment immunity); Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (state's consent must be "unequivocally expressed"); Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (waiver of immunity only "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction" (alteration in original) (internal quotation marks omitted)). Similarly, the Court has insisted that an act of Congress purporting to abrogate a state's sovereign immunity under section 5 of the Fourteenth Amendment will not be effective unless Congress's intent to abrogate is "unmistakably clear." Nevada Dep't of Human Resources v. Hibbs, 538 U.S. 721, 726, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); see Kimel v. Florida Board of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (same); Dellmuth v. Muth, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (same). In the same vein, the Court has ruled that when Congress imposes a condition on a state's receipt of federal funds, it must do so "unambiguously" to ensure that the state's acceptance of the "`contract'" is "voluntar[y] and knowing[]." Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).
 
 
 25
 More pertinent to our issue is the Court's development of what it has called the "unmistakability doctrine," United States v. Winstar Corp., 518 U.S. 839, 871, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion), whereby "sovereign power . . . will remain intact unless surrendered in unmistakable terms," Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). In Winstar, Congress had changed the relevant law and prevented the Government from honoring certain contractual agreements it had entered into with several financial institutions. See Winstar, 518 U.S. at 843, 116 S.Ct. 2432. Although the Supreme Court held that the Government was liable for breach of contract, id. at 910, 116 S.Ct. 2432, the Court emphasized that the unmistakability doctrine was inapplicable because the plaintiffs were claiming that the Government had assumed the risk that it might have to pay damages in the event of subsequent changes in federal law, not that it must be enjoined from applying those changes to the plaintiffs, see id. at 871, 116 S.Ct. 2432. In Doe-SORA IV, the District Judge concluded that the unmistakability doctrine as described in Winstar was not relevant to the Stipulation because the contracts in Winstar were not "entered into to resolve judicial proceedings." Doe-SORA IV, 427 F.Supp.2d at 410. We believe that a clear statement of intent to surrender a state's legislative authority is even more appropriate when the alleged restrictions on future law-making power are part of an agreement authorized and enforced by a federal court. In the pending case, the State cannot be held to have surrendered in a consent decree its authority to amend its statutes unless the decree clearly indicates that intention. In the absence of such clear indication, the recitation of existing statutory provisions is properly construed to do no more than serve as notice of what the state law then provided.
 
 
 26
 The recitation in the Stipulation of the then-existing duration and notification requirements served a helpful purpose of clarity. The parties needed to know that the Plaintiffs' risk levels would be redetermined under the regime existing before the 2002 amendment, that the then-existing duration requirements would extend from the date of an offender's original registration, and that the then-existing notification requirements would currently apply. The Stipulation and its accompanying notices provided this useful information, but the Stipulation and the decree cannot properly be construed to surrender the State's power to modify the recited requirements.[13]
 
 Conclusion
 
 27
 The orders of the District Court, enjoining the State from applying the January 2006 and June 2006 amendments, are vacated.
 
 
 28
 Judge POOLER dissents with a separate opinion.
 
 
 
 Notes:
 
 
 [1]
 In fact, the pending case was never certified as a class action, presumably because the Plaintiffs withdrew their request for class certification upon the State's agreement that the District Court's rulings as to the named Plaintiffs would apply to those who were within the putative class described in the complaint
 
 
 [2]
 The Supreme Court later rejected anEx Post Facto Clause challenge to Alaska's Megan's Law. See Smith v. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).
 
 
 [3]
 As the District Court correctly noted, the Stipulation was the equivalent of a consent decree,see Doe v. Pataki ("Doe-SORA IV"), 427 F.Supp.2d 398, 404 (S.D.N.Y.2006), and the State has not sought review of that determination on this appeal. We will therefore refer to the Stipulation as a consent decree throughout this opinion, and our analysis applies to consent decrees whether or not they are explicitly denominated as such by the parties.
 
 
 [4]
 Paragraph fifteen states in its entirety:
 If a plaintiff's risk level is determined to be a level 2, that plaintiff will be considered to be a level 2 offender as of March 11, 2002; therefore, the duration of the registration requirement will be 10 years from the date of his or her original registration. If a plaintiff's risk level is determined to be a level 3, that plaintiff will be considered a level 3 offender as of March 11, 2002, requiring lifetime registration with the possibility of relief from registration 13 years after the date of his or her original registration. If a plaintiff's risk level is reduced to a level 1, that plaintiff will be considered a level 1 offender as of March 11, 2002; therefore, the duration of the registration requirement will be ten years from the date of his or her original registration.
 
 
 [5]
 For the remainder of this opinion, unless otherwise indicated, we refer generally to the group of persons benefitting from the District Court's various rulings as "the Plaintiffs." In fact, the Stipulation and the District Court's rulings make distinctions within the entire group of convicted sex offenders depending on various details such as the date of conviction and the applicable risk category. These details need not be recounted as none of them affects the ruling reflected in this opinion
 
 
 [6]
 The State has not renewed this jurisdictional argument on appeal
 
 
 [7]
 In this case, there is no indication that the District Judge participated in developing any of the terms of the Stipulation that resulted in the decree
 
 
 [8]
 Our dissenting colleague appears to doubt that there is ambiguity as to the meaning of the Stipulation and then suggests that, if there is ambiguity, there is also a question as to whether the dispute as to the meaning of the Stipulation is "legitimate." Dissenting op. at [81]. Whether the recitations of duration of registration and scope of notification are set forth in the Stipulation only to reflect then-current state law or to bind the State to continue those provisions in force in the future is surely an ambiguity on which the parties (and any reader of the Stipulation) may reasonably differ, and the "legitima[cy]" of that dispute need not be further explained in order to require that it be resolved
 
 
 [9]
 The Plaintiffs argue and the District Judge agreed that the ten-year registration duration was a key part of the parties' bargain because it encouraged level two Plaintiffs whose registration periods were soon to expire to waive their rights to a redetermination hearing. But the Plaintiffs' counsel conceded at the initial oral argument that the parties never bargained over the registration duration. Moreover, the fact that the registration duration then existing under the SORA may have encouraged some Plaintiffs to waive their rights to a redetermination hearing does not mean that the Plaintiffs bargained for that duration or that the State surrendered its legislative authority to increase the duration
 To whatever extent the District Court might have made an implicit finding as to the parties' intent to maintain the then-existing duration and scope provisions and even if we assume that such a finding was a finding of fact rather than a conclusion of law based on a construction of the Stipulation, such a finding would be clearly erroneous for lack of any objective evidence that the parties intended the duration and scope recitations to be anything other than a reflection of then-current state law and to have the effect of prohibiting the State from applying future legislation on these topics to the Plaintiffs.
 
 
 [10]
 The Plaintiffs appear to argue that if the decree does not guarantee them the duration of registration and the scope of community notification existing at the time of the Stipulation, they achieved no substantial benefit from it because the hearing procedures ordered by the District Court had already been incorporated into state law. But the 1999 amendment incorporating the hearing procedures required by the District Court applied only prospectively and did not provide for redeterminations of risk levels already assigned. Moreover, even if the 1999 amendment conferred any procedural rights on the Plaintiffs, the decree provided the Plaintiffs the substantial benefit of enforcing compliance with these procedures by invoking the District Court's contempt power, rather than by initiating a new lawsuit in the event of noncompliance with statutory requirements
 
 
 [11]
 We have no occasion to consider whether a state court's subsequent limitation on the power of a state's executive authority to surrender any portion of a state's legislative authority might undo a commitment to continue a state law provision in force, thereby risking invalidation of the entirety of a consent decreeCf. Pigford v. Glickman, 206 F.3d 1212, 1219 (D.C. Cir.2000) (holding open possibility of modification of decree in the event of subsequent legislation).
 
 
 [12]
 The District Judge considered the deference normally accorded a state's authority to legislate, but did so only to answer what he understood to be the State's contention that it was entitled to abrogate terms of the Stipulation. Whether or not the State was asserting such a position, we are emphasizing the State's normal legislative authority, not for the purpose of authorizing any breach of the Stipulation, but for the far more limited and entirely appropriate purpose of construing the operative effect of the agreement that the State has made
 
 
 [13]
 Our dissenting colleague points out that a party responsible for changed conditions that make contract performance impossible cannot assert such impossibility as a defenseSee dissenting op. at [85]. That observation has no relevance to the pending litigation. The State is not contending that performance is impossible or impracticable. It is disputing only the extent of its contractual obligations, and it is correctly asserting that, under the Stipulation as properly construed, it did not contract to surrender its legislative power to modify provisions of state law mentioned in the Stipulation only to recite the content of then-current law. Nor is there any basis for a remand, see dissenting op. at [85], to take evidence as to the parties' intent on whether the recited state law provisions were to remain unamended. The Plaintiffs have made no claim that objective evidence exists beyond the undisputed circumstances we have discussed, which provide a clear basis for construing the Stipulation in the State's favor.
 
 
 
 29
 POOLER, Circuit Judge, dissenting.
 
 
 30
 I respectfully dissent. I believe the majority has reached a wrong conclusion because it has ignored basic principles of contract law. While the majority references the guiding principles of contract law, the majority opinion discusses them in only the most limited detail. In another very brief section, which cites only generally inapposite constitutional law, the majority opinion attempts to explain why the state should be treated differently from any other contracting party.
 
 
 31
 While the district court below devoted substantial analysis to this problem and the relevant doctrine, Doe-SORA IV, 427 F.Supp.2d at 411[1] (citing, inter alia, United States Trust Co. v. New Jersey, 431 U.S. 1, 17, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977)),[2] on appellate review the majority has eschewed this approach, and instead focused on discerning the intentions of the parties. This approach is problematic, since as even defendants-appellants had initially argued, the stipulation is not ambiguous, and we cannot ignore the lack of ambiguity merely because its plain meaning does not correspond with the parties' alleged intentions.
 
 
 32
 This court cannot merely point to the absence of additional language specifying the allocation of risk in the event of changed circumstances as a basis for shifting that risk onto the obligee. This approach, along with the imposition of a new clear statement rule retroactively, so as to shift the burden of changed circumstances away from the party who would traditionally bear it, are radical departures from our earlier jurisprudence and the long-standing principles of the common law. Furthermore, if the agreement was ambiguous, the only prudent approach would be to remand to the district court for further fact finding, given the paucity of the record. Instead, the majority opinion relies on the absence of evidence, inapplicable principles of contract interpretation, and faulty analogies to inapposite constitutional law to establish a basis for reformation of the stipulation.
 
 
 33
 
 I. Under New York Law and the Principles Embodied in this Circuit's Caselaw, the Stipulation at Issue is Not Ambiguous
 
 
 
 34
 A dispute over the meaning of a provision in a written instrument after it is executed does not generate ambiguity. It is the text of the agreement itself which must be ambiguous before a court can construe the contract in view of the objective evidence of the parties' shared intentions. However, the majority opinion does not identify the words, syntax or punctuation that render the stipulation ambiguous, stating only that while "there is no dispute as to the meaning of the words in these recitations," "there is a dispute [as to their] operative effect." The first question before us is whether this dispute is legitimate. The majority opinion does not address this question. Rather than pointing to internal textual inconsistencies that might illustrate the purported ambiguity, it proceeds immediately to the determination of how the stipulation should be construed.
 
 
 35
 This court has held — repeatedly and consistently — that before resorting to indicia of intent, we must determine that an ambiguity is present on the face of the contract; it is not sufficient for the contract to merely appear ambiguous in the light of the previous dealings between the parties. This foundational principle applies equally to consent decrees: "[w]hen the language of a consent decree is unambiguous, the scope of a consent decree must be discerned within its four corners." United States v. Broad. Music, Inc., 275 F.3d 168, 175 (2d Cir.2001).
 
 
 36
 This "plain meaning" approach to contract construction is the well-established law of the circuit. Roberts v. Consolidated Rail Corp., 893 F.2d 21, 24 (2d Cir.1989) ("[a]bsent an ambiguity in a written contract, courts will not look to the underlying intent of the parties in executing the contract"); see also O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 58-59 (2d Cir.1994) (holding that the question of "[w]hether contract language is ambiguous . . . is resolved by reference to the contract alone") (internal quotation marks omitted); accord Collins v. Harrison-Bode, 303 F.3d 429, 433 (2d Cir.2002) (noting that "[u]nder New York law, the question of ambiguity vel non must be determined from the face of the agreement, without reference to extrinsic evidence").[3]
 
 
 37
 Conversely, the majority reasons, without even mentioning the question of ambiguity, that the "[p]roper construction of the recitations at issue, we believe, depends not only on the words of the Stipulation, but also, and more importantly, on whether the parties intended to place these words into the agreement as part of a resolution of disputed matters." Majority Op. [76] (emphasis added). This approach is contrary to our precedent and the principles of contract law, which the majority agrees should govern. Majority Op. [75].
 
 
 38
 The importance of our steadfast adherence to the plain meaning rule becomes clear when we consider the unbridled freedom an appellate court has when it is abandoned; we could then rewrite any contract to correspond with what we believe to be the intentions of the parties, utilizing the exceptional equitable remedy of reformation under the guise of contract construction. However, "[t]here is no power at common law to reform a written instrument." 76 C.J.S. Reformation of Interests § 2; see also e.g. Ivinson v. Hutton, 98 U.S. 79, 82, 25 L.Ed. 66 (1878). Accordingly, "[a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir.2000).
 
 
 39
 Despite this governing precedent, the reformation of the stipulation is precisely what the majority opinion effects. Here, the majority's recharacterization of the "operative effect" of these provisions — into a mere reference to the state of the existing law — effectively inserts a new provision of critical importance into the agreement. The contract, as rewritten by the majority, now contains a new provision in the sections referring to SORA's notice and duration of registration requirements that reads: "these terms are included only to provide an indication of the existing statutory provisions; the State of New York reserves the right to modify the scope and term of your registration as a sex offender," despite the fact that "[a] promise . . . with a reserved right to deny or change the effect of the promise, is an absurdity." Murray v. Charleston, 96 U.S. 432, 445, 24 L.Ed. 760 (1877).
 
 
 40
 
 II. The District Court's Factual Findings Were Not Clearly Erroneous
 
 
 
 41
 Even if the stipulation is ambiguous, we would be required to address the district court's factual findings, to which we owe considerable deference, in far more detail to be confident that vacatur is required. However, the majority opinion does not address this issue squarely, relegating to a footnote the finding that "to whatever extent the District Court might have made . . . finding[s] . . . [they] would be clearly erroneous." Majority Op. [77 n. 9]. However, since "[w]here there are two permissible views of the evidence [of the parties' intent], the court's pure findings of fact cannot be termed clearly erroneous," United States Naval Institute v. Charter Communications, Inc., 875 F.2d 1044, 1049 (2d Cir.1989), the majority opinion implicitly holds in the alternative that the district court's well-reasoned and thoughtful opinions below contained findings that were not even plausible. "The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo . . . . [T]he court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
 
 
 42
 The district court found that defendants-appellants had "agreed to, and indeed bargained for" the notification procedures applicable to each class of SORA registrants, as embodied in the consent decree. Doe-SORA V, 439 F.Supp.2d at 326, see also Doe-SORA IV, 427 F.Supp.2d at 408-09 (considering how the circumstances of the litigation illuminate the parties' intentions). While the majority opinion contains a discussion of why the external evidence of the parties' intentions can be cast in a different light so as to reach a different finding, it does not address the pertinent question, of whether the district court's factual findings are so implausible as to constitute an impermissible view of the same record. Majority Op. [15-18]. Consequently, even if this court could demonstrate that the stipulation was ambiguous on its face, vacatur would not be warranted, because the district court's conclusion is a permissible view of the evidence.
 
 
 43
 The majority opinion notes that there was no "objective evidence that the parties intended the duration and scope recitations to have the effect of prohibiting the State from applying future legislation on these topics to the Plaintiffs." Majority Op. [77 n. 9]. However, the district court relied on the very same type of evidence that the majority argues is dispositive: the context provided by the earlier litigation. See, e.g. Doe-SORA IV, 427 F.Supp.2d at 408-09. If this is not the sort of "objective evidence" that is adequate to support the district court's holding, it is not apparent why it would provide a more sufficient basis for this court's fact finding, particularly as "few persons are in a better position to understand the meaning of a [settlement] than the district judge who oversaw and approved it." United States v. Local 359, United Seafood Workers, 55 F.3d 64, 68 (2d Cir.1995).
 
 
 44
 The majority opines further that "there is no indication that the District Judge participated in developing any of the terms of the Stipulation that resulted in the decree." Majority Op. [76 n. 7]. That may be true, but it does not establish that the district court was not familiar with the specifics of the dispute between the parties and their attempts at resolution. The District Judge below supervised — over the span of ten years — various challenges plaintiffs-appellants made to SORA, litigation which the majority believes to provide it with the necessary context for its construction of the consent decree. See Doe-SORA III, 3 F.Supp.2d 456 (Chin, J.); Doe-SORA I, 940 F.Supp. 603 (Chin, J.); Doe v. Pataki, 919 F.Supp. 691 (S.D.N.Y. 1996) (Chin, J.). Accordingly, the principle of deference this court announced in Local 359 applies a fortoiri in the instant case; there is no compelling argument in the majority opinion why it should be set aside.
 
 
 45
 
 III. The Majority Relies on the Fact that One Party is a State, Without Specifying Precisely Why this Is Central to Construing the Contract: Winstar is Inapplicable
 
 
 
 46
 The majority believes that the most important features of the context of the agreement are that one of the parties is a state, and that the designated forum for its enforcement is a federal court. While this is not unreasonable in itself, it leads the majority to another departure from this circuit's precedent by inspiring the creation of an unprecedented clear statement rule. While the majority opinion presents this new rule as a straightforward application of Supreme Court precedent, it misconstrues the leading case.
 
 
 47
 The majority notes that federal courts exhibit a "traditional concern[ ] . . . for restrict[ing] a state's inherent powers." Majority Op. [77]. Accordingly, it reasons that a court construing a consent decree must have "a clear indication that a state has intended to surrender its normal authority to amend its statutes." Id. at [78]. However, what is at issue here is not a wholesale surrender of the police power or an implicit disavowal of the right to amend the statutes that exercise it, but rather whether a state may make a binding promise to certain of its citizens not to subject them to those future amendments.
 
 
 48
 The majority relies on United States v. Winstar Corp. to support the novel clear statement rule, which it retroactively applies to plaintiffs-appellants, but the opinion does not engage in the analysis deemed critical by the Supreme Court in that case: whether the particular agreement at issue is of the type to which the unmistakability doctrine — i.e. the doctrine that requires that a contract purportedly binding a state to contractual obligations despite later legislative amendments to clearly indicate its intent to be so bound — is properly applicable:
 
 
 49
 Injecting the opportunity for unmistakability litigation into every common contract action would, however, produce the untoward result of compromising the Government's practical capacity to make contracts, which we have held to be of the essence of sovereignty itself. From a practical standpoint, it would make an inroad on this power, by expanding the Government's opportunities for contractual abrogation, with the certain result of undermining the Government's credibility at the bargaining table and increasing the cost of its engagements.
 
 
 50
 518 U.S. 839, 884, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion).[4] Accordingly, the majority's invocation of the unmistakability doctrine here in support of deference to state sovereignty is perplexing. The state also exercised a sovereign power when executing the stipulation; the majority opinion does not consider whether a federal court's declaration that this sovereign act was implicitly limited is consistent with the principles of federalism.[5]
 
 
 51
 Winstar establishes that when no clear statement rule such as the unmistakability doctrine is properly applicable, a sovereign may be held liable for its abrogation of a contractual agreement, because in that event, a bedrock principle of the common law dictates this outcome. The applicable principle is that a party assumes the risk that it will not be able to perform its obligation under the contract. Day v. United States, 245 U.S. 159, 161, 38 S.Ct. 57, 62 L.Ed. 219 (1917) (Holmes, J.) ("One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking"). Although the majority opinion states that "there is no indication, however, that the Plaintiffs sought to have the duration-of-registration or the scope-of-notification requirements remain unaltered by subsequent state legislation," Majority Op. [77], this absence merely indicates that there was no provision in the contract stating that the government will be liable in the event that it cannot perform, because it would have been superfluous.
 
 
 52
 The Supreme Court reaffirmed in Winstar that the government cannot ignore the common-law principle that a party responsible for the changed circumstances that make performance of its contractual obligations impossible cannot evade responsibility by pointing to the changed circumstances, or by asserting that the contract did not specify what should occur in that event. 518 U.S. at 904-910, 116 S.Ct. 2432. Put simply, "[i]f the adverse event is due to the fault of the obligor, the offending party cannot be heard to cry that performance is impracticable." 30 Williston on Contracts § 77:1 (4th ed.); see also Restatement (Second) of Contracts § 264 cmt. a (1981).
 
 
 53
 It follows directly from this principle that a state which amends its laws, such that it cannot perform its contractual obligation, is barred from asserting the defense of impracticability. See, e.g., 14 Corbin on Contracts, § 76.1 (2006) ("[t]he rule favoring discharge [for legal impossibility] following government prohibition does not apply, however, when the government action affects the contractual duties of the government itself.") The majority opinion turns this principle on its head. More problematically, it manufactures a wide-ranging exception to the common law, that: "the normal rules of construction may vary depending on the nature of the parties and the effect of enforcement," Majority Op. [76] and applies this exception for the first time here to create an additional hurdle for those attempting to vindicate their contractual rights against the government.
 
 
 54
 
 IV. If the Majority Believes the Contract is Ambiguous, The Proper Disposition is Remand
 
 
 
 55
 The majority opinion also fails to mention that the usual evidence that a court ordinarily uses to discern the parties' intentions is absent from the record before us. If the majority believes that the intentions of the parties are central to the proper construction of the contract, surely these intentions should be probed under oath, rather than relying on the representations of their attorneys at oral arguments. The majority opinion does not advance any reasons why this court should not undertake the normal course of action when we hold that a contract is ambiguous, which is to remand to the district court for an evidentiary hearing on the issue of the parties' intentions, where the parties might then submit parol evidence and evidence of custom and usage, among any other forms of evidence that might be probative of the parties' intent. See Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 87 (2d Cir.2002). To make findings about the intentions of the parties according to the averments of counsel when we can easily remand for reopening of the record and further fact finding is contrary to our precedent that the "resolution of [factual] problems is not the province of an appellate tribunal, but of the trial court." M.W. Zack Metal Co. v. S.S. Birmingham City, 291 F.2d 451, 454 (2d Cir.1961).
 
 
 56
 In addition to what might be discovered if we were to allow for the introduction of parol evidence on remand, a hearing might reveal that the parties' intentions may even have been memorialized, and in any event, what is testified to under oath might be more illuminating than what was merely averred. At present, we also do not know if either party had any reason to be aware that the other was operating with a different understanding of the provisions now at issue, a point of critical importance. We also have no evidence as to which party chose the language at issue, so we cannot invoke the doctrine of contra proferentem.
 
 
 57
 Finally, since the government's performance under the stipulation was frustrated by the legislation, any court that would decide the outcome of this dispute should have evidence of whether that legislation was foreseeable — a question this court probed at oral argument without success — since "[i]f the risk of impossibility of performance was foreseeable, that contingency should have been addressed in the contract. The absence of such a contractual provision gives rise to an inference that the risk was assumed [by the obligor,]" in this case, the government. 30 Williston on Contracts, § 77.95 (4th ed.).
 
 
 58
 Instead of allowing for the introduction of the evidence necessary for a well-reasoned resolution, the majority opinion reasons from the absence of evidence. The majority opinion mentions that there is "no indication" that certain events occurred — twice. If it not clear that opening the record would not reveal any such indications, there is no reason why this court should not allow the introduction of what might well prove to be crucial to our determination.
 
 
 59
 While the question of whether or not the contract is ambiguous is one of law, determining the intent of the parties is not only factual, but often requires a painstaking reconstruction of their motivations and strategies and how these changed over time. "Words and conduct used in the process of making a contract — offers, acceptances, modifications, preliminary communications not themselves operative in any way — all these need interpretation . . . before we can determine the operative effect that should be given to the contract." 5 Corbin on Contracts, § 24.1 (2006). The majority opinion states that "what is in dispute is the operative effect of these recitations," Majority Op. [76], but resolves this question without even seeing any evidence of the words and conduct of the parties' negotiations, never mind attempting to interpret this evidence. This is a difficult endeavor in the best of circumstances: to attempt it with nothing but a cold and bare record as a guide is obdurate.
 
 
 CONCLUSION
 
 
 60
 I cannot join in the majority's opinion. It dispenses with the plain meaning rule of contractual interpretation by proceeding directly to the question of the parties' intent without identifying an ambiguity visible on the face of the stipulation; it effectively reforms the stipulation, by means of what is admittedly construction — which this court has no authority to do in the absence of such an ambiguity; it does not adhere to several foundational principles of the common law of contracts; and it resolves the ambiguities as to the parties' intentions on the basis of an absence of evidence, where it would be a simple matter to reopen the record — which is entirely bare — in order to obtain vital information on several key issues. For these reasons, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 I have adopted the numeration of the cases brought challenging SORA by the plaintiffs-appellants as set forth in the majority opinion
 
 
 [2]
 As will be discussed in Section III,infra, the question of whether a state can modify its contractual obligations through the amendment of legislation is a vexing one. While states possess a police power which the federal courts should avoid hindering, "[t]he United States Constitution prohibits the impairment of the obligation of contracts by the states. . . . [M]ost courts have held that statutes enacted subsequent to the making of a contract are not incorporated in the contract. . . . [Accordingly,] [t]o hold that such statutes are incorporated would possibly be an unconstitutional impairment of contract rights, because the parties assented to be bound to a different set of rights and obligations." 5 Corbin on Contracts, § 24.26 (2006).
 
 
 [3]
 This court has implicitly held that the state law of the forum applies to stipulations settling federal claimsTorres v. Walker, 356 F.3d 238, 245-46 (2d Cir.2004). This court has also determined that the principle of whether the existence of ambiguity in a written agreement must be determined from the face of the agreement is embodied in New York law. Collins, 303 F.3d at 433 Accordingly, by looking instead to the attendant circumstances to reveal the ambiguity, the majority opinion not only disregards the circuit's precedent, but binding New York law, a violation of the very principles of federalism that the majority argues should inform our decision.
 
 
 [4]
 While it is virtually certain that the stipulation at issue in the instant case would be governed by the unmistakability doctrine if the United States were one of the parties, it far from certain whether it applies here, since the Contract Clause applies directly to the States, whereas Congress is merely the subject of analogous but less exacting limitations on its ability to abrogate its contractual obligations derived from the Due Process Clause. U.S. Const. art. I, § 10, cl. 1; U.S. Const. amend. V;see also United States Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (contrasting Contract Clause with Due Process Clause); Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 732-33, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (similar).
 
 
 [5]
 Since the majority opines that the unmistakability doctrine is "more pertinent to the issue" here than the clear statement rules for the surrender of sovereign immunity, Majority Op. [79], the defects in the analogy drawn by the majority between this case and our Eleventh Amendment jurisprudence need not be explored, except to note that the surrender of immunity from suit in federal court vests jurisdiction where a federal court would otherwise have none,see Seminole Tribe v. Florida, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), but there is no such "jurisdictional bar" to a district court's construction of a stipulation executed under that court's supervision, especially where the parties explicitly bargained for that court's supervision of the resulting consent decree. Cf. Geller v. Branic Int'l Realty Corp., 212 F.3d 734, 737 (2d Cir.2000).